TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-94-00449-CV







Owens-Corning Fiberglas Corporation, Appellant



v.



Delvina P. Stone, Individually and as Special Administratrix


of Robert L. Stone, Deceased, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT


NO. 92-16996-A, HONORABLE PETER M. LOWRY, JUDGE PRESIDING







PER CURIAM



 Appellant Owens-Corning Fiberglas Corporation challenges a judgment rendered
in favor of appellee Delvina P. Stone, individually and as special administratrix of Robert L.
Stone, deceased. Robert Stone had served in the United States Navy for twenty-three years, from
1952 to 1975. He died at the age of fifty-nine.

 Delvina Stone alleged in her pleadings that Robert Stone died from mesothelioma
as a result of exposure to Kaylo, an asbestos-containing insulation product marketed and
manufactured by Owens-Corning. (1) She brought negligence, design defect and marketing defect
claims. The jury found in Stone's favor on the marketing defect claim and awarded more than
$1,288,000 in damages. The trial court rendered judgment on the verdict. Owens-Corning
appeals by eight points of error, challenging the admission of Stone's rebuttal witness's testimony
and its limited cross-examination thereof, causation, and the exclusion of a defense witness's
former testimony. We will affirm the trial-court judgment.



DISCUSSION


 Dr. Egilman's Rebuttal Testimony

 After Owens-Corning rested its case, Stone called Dr. Egilman, a medical doctor
who specializes in occupational therapy, as a rebuttal witness. By point of error four, Owens-Corning complains that the trial court erred in admitting the testimony of Dr. Egilman because
it was not proper rebuttal testimony. Tex. R. Civ. P. 265. 

 The admission and exclusion of evidence is committed to the trial court's sound
discretion. City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995); Gee v. Liberty
Mut. Fire Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989). A trial court abuses its discretion when
it acts without regard for any guiding rules or principles. Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241-42 (Tex. 1985), cert. denied, 476 U.S. 1159 (1985). A person seeking to
reverse a judgment based on evidentiary error need not prove that but for the error a different
judgment would necessarily have been rendered, but only that the error probably resulted in an
improper judgment. The complaining party must show that the judgment turns on the particular
evidence admitted or excluded to successfully challenge the evidentiary ruling. See GT & MC,
Inc. v. Texas City Ref., Inc., 822 S.W.2d 252, 257 (Tex. App.--Houston [1st Dist.] 1991, writ
denied); Atlantic Mut. Ins. Co. v. Middleman, 661 S.W.2d 182, 185 (Tex. App.--San Antonio
1983, writ ref'd n.r.e.). We determine whether the case turns on the evidence admitted or
excluded by reviewing the entire record. Boothe v. Hausler, 766 S.W.2d 788, 789 (Tex. 1989);
Gee, 765 S.W.2d at 396.

 Owens-Corning claimed that the Navy was solely responsible for Stone's injuries
because Navy specifications required asbestos in its insulation. The crux of Dr. Egilman's
testimony was that Owens-Corning, through its participation in the National Insulators
Manufacturing Association (NIMA), influenced the Navy's specifications. This was proper
rebuttal testimony. Owens-Corning also sought to avoid liability by introducing documents to
prove that it did not know of the hazards of asbestos. Documents that Dr. Egilman reviewed on
the stand countered that assertion. We conclude that the trial court did not abuse its discretion
by admitting Dr. Egilman's testimony. We overrule point of error four.

 By points of error one, two, three, and five, Owens-Corning complains that the
trial court improperly limited its cross-examination of Dr. Egilman. Dr. Egilman's testimony was
limited because several jurors needed to leave that day by 5:00 and he was unavailable to testify
the following day. Dr. Egilman's began his direct testimony sometime after 4:12 and his cross-examination at 4:39.

 Owens-Corning objected to the trial court that it had been prejudiced because it had
not been able to cross-examine Dr. Egilman regarding two issues. First, it complained that it did
not have an adequate opportunity to question him on the risk versus the utility of Kaylo. Owens-Corning could not have been harmed by the lack of cross-examination regarding the risk/utility
of Kaylo because the jury found that Kaylo was not defective, taking into consideration "its utility
and the risk involved in its use."

 Second, Owens-Corning objected that it did not adequately explore the development
of knowledge and the relationship between its documents and general medical literature. Dr.
Egilman did not testify regarding general medical literature; to the extent that he testified
regarding what Owens-Corning knew or should have known, we conclude that the limitation was
harmless because his testimony was cumulative of other properly admitted testimony. Tex. R.
App. P. 81(b)(1); Keene Corp. v. Rogers, Jr., 863 S.W.2d 168, 179 (Tex. App.--Texarkana 1993,
writ requested) (stayed due to bankruptcy). Evidence admitted during Stone's case-in-chief that
would support a finding that Owens-Corning knew or should have known of the hazards of
asbestos includes: answers to interrogatories stating that it first learned of a diagnosed case of
asbestosis involving users of asbestos insulation products in 1941; internal documents dated in the
1940's discussing the hazards of asbestos; documents from the 1950's showing that Owens-Corning executives had read laboratory reports dealing with the hazards of asbestos and were
conscious of the hazards involved; correspondence from Saranac Laboratories in 1956 describing
asbestos as a carcinogen and Owens-Corning internal documents stating that the Saranac
correspondence was "nothing that we could show customers or a union"; and workers'
compensation suits filed in the 1960's claiming asbestosis and lung cancer as a result of exposure
to Kaylo. (2)

 Owens-Corning claims that the testimony is not cumulative because it objected to
the admission of the other testimony. The issue is whether the testimony is cumulative of other
properly admitted testimony; Owens-Corning has waived error since it does not challenge on
appeal the admission of the other testimony. Nevertheless, we will address the propriety of the
admission of the evidence.

 In a failure-to-warn case, the plaintiffs must establish that the dangers were
reasonably foreseeable or scientifically discoverable at the time of the exposure. Fibreboard
Corp., 813 S.W.2d at 668. All manufacturers are held to the knowledge and skill of an expert
in the field. Id. A plaintiff may establish what the defendant should have known by expert
testimony, lay testimony, or documentary evidence showing what information of risks was
available to defendants. USX Corp. v. Salinas, 818 S.W.2d 473, 484 (Tex. App.--San Antonio
1991, writ denied).

 The challenged evidence included documents in which Owens-Corning personnel
discussed the general hazards of asbestos and documents addressed to Owens-Illinois, Owens-Corning's predecessor in interest, regarding laboratory tests on Kaylo. Evidence of Owens-Corning's knowledge of the general hazards of asbestos is relevant to show whether Owens-Corning should have known about the dangers of Kaylo. Owens-Corning Fiberglas Corp. v.
Keeton, No. 03-94-00055-CV (Tex. App.--Austin May 8, 1996, no writ h.); Fibreboard Corp. v.
Pool, 813 S.W.2d 658, 669 (Tex. App.--Texarkana 1991, writ denied), cert. denied, 113 S. Ct.
2339, 3037, 3064 (1993). Laboratory reports addressed to Owens-Illinois that specifically
documented hazards associated with Kaylo are also relevant to show whether Owens-Corning
should have been aware of the hazards associated with Kaylo; further, because Louis Saxby, Jr.,
Owens-Corning's vice-president, testified that Owens-Corning had received the final Saranac
report, the evidence is relevant to show what Owens-Corning actually knew of Kaylo's hazards. 
See Fibreboard, 813 S.W.2d at 669. The challenged evidence was properly admitted.

 Owens-Corning also claims that the testimony was not cumulative because Dr.
Egilman was the only witness to testify regarding "the extent of Owens-Corning's knowledge" of
the dangers of asbestos. Opinion testimony about state-of-mind is generally inadmissible. See
Davis v. Peck, 94 S.W.2d 1245, 1247 (Tex. Civ. App.--Amarillo 1936, writ dism'd) (no opinion
testimony as to knowledge or state of mind); cf. James v. Texas Dep't of Human Servs., 836
S.W.2d 236, 244 (Tex. App.--Texarkana 1992, no writ) (no opinion testimony as to truthfulness). 
Stone did attempt to elicit testimony from Dr. Egilman regarding the extent of Owens-Corning's
knowledge. (3) But, when Owens-Corning properly objected to opinion testimony regarding its state
of mind, that objection was sustained. In the single instance in which Owens-Corning was
overruled on a state-of-mind objection, Dr. Egilman simply reviewed on the stand an Owens-Corning document that showed the relative exposure to asbestos dust in shipyards and in factory
settings, and extrapolated from that that Owens-Corning knew that the exposure in shipyards was
higher. In light of the other properly admitted evidence, and the fact that Owens-Corning did not
object to Dr. Egilman's every attempt to testify to what Owens-Corning knew, the admission of
Dr. Egilman's testimony is harmless. Tex. R. App. P. 81(b).

 In Davidson v. Great National Life Ins. Co., 737 S.W.2d 312 (Tex. 1987), the
supreme court considered whether the trial court erred by limiting cross-examination of a witness
who identified the deceased as the insured. The court held that no error occurred because other
witnesses substantiated that fact, even if they were interested witnesses and their testimony was
somewhat inconsistent. Id. at 315. Here, a plethora of documents, and the testimony of
Owens-Corning vice president Saxby, contained evidence from which the jury could have
reasonably deduced that Owens-Corning knew of the dangers of asbestos but did not warn its
consumers. Although the situation was not ideal, we conclude that any error in allowing
Dr. Egilman to testify under circumstances in which his testimony would be limited is harmless.

 Further, when Stone realized that Dr. Egilman could not return the following day,
she moved the court to allow him to testify out of order, during Owens-Corning's presentation
of its case. Owens-Corning resisted the motion on the grounds that bringing a rebuttal witness
before the testimony to be rebutted was offered would confuse the jury and that it would prejudice
it to be "sandwiched" in between Stone's witnesses. Owens-Corning could have accepted Stone's
offer if it was truly concerned about its ability to thoroughly cross-examine Dr. Egilman. The
record shows that Owens-Corning had cross-examined Dr. Egilman in other proceedings and was
cognizant of the substance of the testimony he would offer.

 Finally, Owens-Corning, relying primarily on Goldberg v. Kelly, 397 U.S. 254,
269 (1970), and Steddum v. Kirby Lumber Co., 221 S.W. 920, 921 (Tex. 1920), complains that
the limited cross-examination deprived it of due process. Neither case is on point: in Goldberg,
the person deprived had no opportunity at all to cross-examine witnesses, and in Steddum, the
court simply held that a wife's property rights could not be forfeited except in a proceeding to
declare a forfeiture with notice and an opportunity to be heard. Owens-Corning cites no factually
similar case to support its due process claim, nor do we find one. We overrule points of error
one, two, three, and five.



 Causation

 By points of error six and seven, Owens-Corning claims that there was no
evidence, or alternatively, factually insufficient evidence, to support the jury's finding of
causation. In evaluating a no-evidence point, we must consider only the evidence and inferences
tending to support the finding of the trier of fact and disregard all evidence and inferences to the
contrary. Alm v. Aluminum Co. of Am., 717 S.W.2d 588, 593 (Tex. 1986), cert. denied, 498
U.S. 847 (1990); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). See generally William
Powers, Jr. & Jack Ratliff, Another Look at "No Evidence" and "Insufficient Evidence", 69 Tex.
L. Rev. 515 (1991); Michol O'Connor, Appealing Jury Findings, 12 Hous. L. Rev. 65 (1974). 
When reviewing a jury verdict to determine the factual sufficiency of the evidence to support a
finding on which the appellee had the burden of proof at trial, we must consider and weigh all the
evidence and should set aside the judgment only if the evidence is so weak as to be clearly wrong
and manifestly unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In re King's Estate, 244
S.W.2d 660, 661 (Tex. 1951); see also Pool v. Ford Motor Co., 715 S.W.2d 629 (Tex. 1986);
Federal Deposit Ins. Corp. v. Golden Imports, Inc., 859 S.W.2d 635, 640 (Tex. App.--Houston
[1st Dist.] 1993, no writ). See generally William Powers, Jr. & Jack Ratliff, Another Look at "No
Evidence" and "Insufficient Evidence," 69 Tex. L. Rev. 515 (1991).

 Owens claims that the evidence is not sufficient to make it liable for the failure to
warn because it included a label on its product beginning in 1966. To create liability, an
unreasonably dangerous product must be a producing cause of a plaintiff's injuries. Magro v.
Ragsdale Bros., Inc., 721 S.W.2d 832, 834 (Tex. 1986). When a manufacturer fails to warn or
instruct, a rebuttable presumption arises that the user would have read and heeded such warning
or instruction. See General Motors Corp. v. Saenz, 873 S.W.2d 353, 359 (Tex. 1993). 
However, the presumption does not arise when a manufacturer gives a warning which, if heeded,
would have prevented the accident. Id. Owens-Corning claims that Stone is not entitled to the
presumption because it warned users not to breathe Kaylo dust, but they did anyway. 

 We need not consider the effect of Owens-Corning's label because Stone was
exposed to asbestos before a label of any sort was placed on Kaylo boxes; furthermore,
Dr. Egilman testified that there was no evidence that Owens-Corning had warned the Navy about
its product's hazards. Two of Stone's three witnesses testified about exposure that occurred
before the label was added in 1966. The Magro presumption that a warning would have been read
and heeded arises because the product carried no warning at all before 1966. Magro, 721 S.W.2d
at 834; see also Saenz, 873 S.W.2d at 359. 

 Owens-Corning also complains that Stone did not prove causation because Robert
Stone's death certificate stated that he died from acute respiratory failure due to or as a
complication of sepsis, due to or as a complication of acute myelogenous leukemia; it listed
mesothelioma as an "other significant condition." (4) 

 Robert Stone saw his physician at Nellie Air Force Base about increasing chest pain
in December 1990. A chest x-ray revealed a mass on the surface of the lung on the right side. 
In January 1991, a needle biopsy of the mass was attempted but the diagnosis was not conclusive. 
In February 1991, a thoracotomy was performed to diagnosis the mass. A consulting physician,
Dr. Sharon Weiss, diagnosed the condition as demosplastic malignant mesothelioma. Robert
Stone was referred to Dr. Howell in June 1991. After viewing the biopsy's pathology, Dr.
Howell concurred that Robert Stone had a very advanced case of mesothelioma. 

 Dr. Howell offered an experimental form of chemotherapy to treat the
mesothelioma, which was a combination of the drug he believed most efficacious to treat the
disease and a hormone he believed could increase the drug's efficacy. Robert Stone also received
radiation therapy to try to shrink the tumor mass and decrease some of the pain resulting from the
tumor's growth through the chest wall. The tumor initially responded well to the regimen, but,
in January 1992, a CT scan revealed new metastasis to the scalp. In May 1992, Robert Stone
opted to end the experimental treatments to eliminate side effects and to spend more time at home. 
The last time Dr. Howell saw Robert Stone, in June of 1992, Stone's pulmonary function was
impaired because the tumor, having grown through the chest wall, was beginning to encase his
lung. Robert Stone died in September 1992. Dr. Howell testified that he believed Robert Stone
died from mesothelioma. 

 Dr. Roggli, a pathologist who reviewed Stone's medical records, also testified that
he believed Robert Stone died of mesothelioma. Both Dr. Howell and Dr. Roggli concluded that,
to the extent that Robert Stone had leukemia at the time he died, it was caused by either the
massive amount of radiation or the chemotherapy Stone received to treat his mesothelioma. 
Further, Dr. Roggli testified that a bone marrow biopsy must be done to make the differential
diagnosis of leukemia as opposed to a leukemoid reaction; this was not done. There was no
controverting testimony. The jury could have concluded from Howell's and Roggli's testimony
that Robert Stone died from mesothelioma.

 Owens-Corning also protests that causation was not proven because mesothelioma
can be caused by agents other than asbestos. Dr. Roggli testified that causes of mesothelioma
other than asbestos existed but were extremely rare. The two other causes of mesothelioma he
identified were a long-term latent infection, like that caused by tuberculosis or some other
bacteria, and radiation exposure. In Dr. Roggli's personal experience, three of four hundred-fifty
cases were caused by an agent other than asbestos. 

 In Robert Stone's case, there was no history of a long-term infection. Owens-Corning cross-examined Dr. Roggli about Robert Stone's possible exposure to radiation while
aboard the U.S.S. O'Bannon during atomic tests in 1961 and 1962 or during the attack on Pearl
Harbor. Dr. Roggli was unaware of any testing. No evidence was introduced regarding the
amount of testing, the dates of the testing, or the medical effects that testing had on Navy
personnel.

 Owens-Corning also complained that the witnesses who testified regarding Stone's
exposure did not establish exposure sufficient to cause mesothelioma. Dr. Roggli testified that
the shortest exposure to asbestos that resulted in diagnosed mesothelioma was one month, but that
even shorter exposures have been reported in rare cases. Delvina Stone called three witnesses
who had served with Robert, two of whom had served with him before 1966.

 Dale Fisher testified that he served with Stone for approximately one year
beginning in 1956. The two met aboard the U.S.S. Brush while the ship was being repaired in
the shipyards at Long Beach. The ship was reinsulated during a four- to six-month period, and,
during that period, asbestos dust surrounded the ship. The men worked in the debris every day
and were required to sleep on board the ship every third night. Evidence was admitted showing
that asbestos exposure associated with shipyards is extreme. Fisher testified that he actually saw
Robert Stone being exposed to asbestos dust. 

 Owens-Corning sought to discredit Fisher's testimony with documents introduced
after Fisher was dismissed showing that the U.S.S. Brush was in the Far East rather than at Long
Beach from February 1956 to February 1957. The same documents showed that the U.S.S. Brush
was in Long Beach for eight months from June of 1955 to February of 1956 and again for seven
months from February 1957 to August 1957. The jury could have inferred that Fisher was
mistaken about the dates rather than the amount and time of exposure. 

 Martin Norton testified that he observed Stone exposed to asbestos dust in the
course of his work on the U.S.S. O'Bannon from 1961 to 1962. Norton was chief of the repair
division. As part of his job, he ordered supplies for repairs, including Kaylo. Also, he
supervised the installation of new insulation on the ship. Norton testified that he had actually seen
Robert Stone in areas where insulation was being cut out and replaced but could not quantify the
number of times.

 A coworker's testimony that his employer used a particular asbestos manufacturer's
products, and that asbestos dust routinely permeated the air, may establish plaintiff's exposure
even if the testifying witness did not observe plaintiff actually using or being exposed to the
product. See Click v. Owens-Corning Fiberglas Corp, 899 S.W.2d 376, 378 (Tex. App.--Houston
[14th Dist.] 1995, no writ); Keene Corp. v. Gardner, 837 S.W.2d 224, 227 (Tex. App.--Dallas
1992, writ denied); see also Migues v. Fibreboard Corp., 662 F.2d 1182, 1185 (5th Cir. 1981). 
From Fisher's and Norton's testimony about Kaylo and ordinary working conditions, and their
certainty about Stone's presence and exposure, a reasonable jury could have concluded that Robert
Stone, more likely than not, inhaled asbestos fibers from Owens-Corning's Kaylo.

 Finally, Owens-Corning claims that the Navy is the sole producing cause of Stone's
damage because its material specifications required asbestos insulation. There was evidence that
the Navy required asbestos insulation for its fire retardant properties, that supply personnel could
not have chosen to order products without asbestos, and that enlisted men had to use the products
regardless.

 However, Dr. Egilman testified that Owens-Corning had influenced the Navy's
specifications through its participation in NIMA. Dr. Egilman also testified that there was no
evidence that Owens-Corning had imparted its knowledge of the hazards of asbestos to the Navy,
that Navy rules did not proscribe warning labels, and that, in his experience, workers who knew
that their health was threatened would take steps to prevent harm. Robert Stone's shipmates
testified that, had they known of the dangers, they would have taken precautions; John McNab,
a supply officer, testified that he would have taken precautions for his safety and that of his men. 
Further, the jury could have rejected the sole-cause argument from the fact that Owens-Corning
could and did get a waiver from specifications to ship asbestos-free Kaylo after it began
manufacturing it.

 Owens-Corning requested and received a jury instruction on sole cause; the jury's
verdict shows that it rejected that argument. We conclude that there was sufficient evidence to
support the jury's decision.

 In sum, testimony was admitted from which the jury could have concluded that
Stone was exposed to asbestos for time periods sufficient to induce mesothelioma; that no other
possible cause of mesothelioma was likely; that Stone in fact died of mesothelioma; and that no
warning was given in spite of what Owens-Corning knew or should have known. The last causal
link -- that a warning would have been read and heeded -- is supplied both by the Magro
presumption and the testimony of Dr. Egilman and Stone's shipmates. We conclude that the
evidence supporting the jury's finding of causation was both legally and factually sufficient. We
overrule points of error six and seven. 



 Dr. Hinshaw's Former Testimony

 By point of error eight, Owens-Corning argues that the trial court erred in
excluding the testimony of Dr. Corwin Hinshaw because it was relevant rebuttal testimony and
it came within the Texas Rule of Civil Evidence 804(b)(1) hearsay exception. The exclusion of
evidence is committed to the trial court's sound discretion. Alvarado, 897 S.W.2d at 753.

 After Dr. Egilman testified, Owens-Corning sought to introduce on surrebuttal the
1984 deposition testimony of Dr. Corwin Hinshaw from a prior case. Rule 804(b)(1), which
addresses the admission of former testimony, requires that the "party against whom the testimony
is . . . offered, or a person with similar interest, had an opportunity and similar motive to develop
the testimony by direct, cross, or redirect examination." Stone was not a party to the prior suit,
so admission of testimony from the prior proceeding turns on whether the plaintiffs' interest in
the prior proceeding was similar to Stone's, and whether they had an opportunity and similar
motive to develop the testimony. It was Stone's responsibility to adequately explain to the trial
court why the interest, motive or opportunity was dissimilar. See Dykes v. Raymark Indus., Inc.,
801 F.2d 810, 816-817 (6th Cir. 1986), cert. denied, 481 U.S. 1038 (1986).

 Stone objected at trial that the motive and opportunity to cross-examine Dr.
Hinshaw differed because many of the documents upon which she relied had not been discovered
at the time of the cross-examination. Dr. Hinshaw, based on his review of published medical
literature, was willing to testify that the medical and scientific community did not and could not
have known of the hazards of asbestos until the late 1970's. Stone based her case on internal
Owens-Corning documents and on unpublished studies performed by or on behalf of Owens-Corning or its predecessor in interest. Without such documents, or reliance on such documents,
the attorneys who attended the 1984 deposition did not have a similar motive or opportunity to
cross-examine Dr. Hinshaw. See Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1160
(4th Cir. 1986) (deposition not admissible against current defendant who stopped selling asbestos
products in 1958 when former defendants continued to sell until 1970's); Murphy v. Owens-Ilinois, Inc., 779 F.2d 340, 343-44 (6th Cir. 1985) (deposition not admissible against current
defendants when current plaintiff had been incidentally exposed to asbestos and prior plaintiffs
were factory workers directly exposed to raw asbestos). (5) We conclude that the trial court did not
abuse its discretion in excluding Dr. Hinshaw's former testimony. We overrule point of error
eight.

 We affirm the trial-court judgment.


Before Justices Powers, Aboussie and Kidd

Affirmed

Filed: June 12, 1996

Do Not Publish
1.   Although Stone is an Alabama resident, she brought suit in Texas. See Tex. Civ.
Prac. & Rem. Code Ann. § 71.031 (West 1986). The parties agreed to try the case under
Texas law.
2.   Owens-Corning did not object at trial that it lacked an opportunity to cross-examine
Dr. Egilman on the issue of its participation in NIMA and so may not raise that issue on
appeal. Estate of Peale v. Teledyne Indus., Inc., 899 S.W.2d 239, 242 (Tex. App.--Houston
[1st Dist.] 1995, writ denied).
3.   Dr. Egilman, a medical doctor, specializes in occupational therapy and teaches a
course on the history of the "development of . . . medical and scientific knowledge in the
20th century." The course considers how scientists and physicians acquire and interpret
information regarding potentially hazardous products, and how they decide whether to
inform people of risk or to remove products from the market.
4.   We consider this and subsequent causation arguments despite the fact that they
appear in Owens-Corning's statement of the case rather than under its points of error. 
Owens-Corning's only argument under points of error six and seven deals with the Magro
presumption.
5.   Federal Rule of Civil Evidence 804(b)(1) requires that the party against whom the
testimony is offered or a predecessor in interest, had an opportunity and similar motive to
develop the testimony. Despite this apparently more stringent requirement, several federal
circuits have interpreted the language as requiring only that a party with a similar interest have
had an opportunity and similar motive to cross-examine the witness. See Horne v. Owens-Corning Fiberglas Corp., 4 F.3d 276, 283 (4th Cir. 1993); Clay v. Johns-Manville Sales
Corp., 722 F.2d 1289, 1293-95 (6th Cir. 1983); Lloyd v. American Export Lines, Inc., 580
F.2d 1179, 1185-87 (3rd Cir. 1978), cert. denied, 439 U.S. 969 (1978).



 whom the testimony
is . . . offered, or a person with similar interest, had an opportunity and similar motive to develop
the testimony by direct, cross, or redirect examination." Stone was not a party to the prior suit,
so admission of testimony from the prior proceeding turns on whether the plaintiffs' interest in
the prior proceeding was similar to Stone's, and whether they had an opportunity and similar
motive to develop the testimony. It was Stone's responsibility to adequately explain to the trial
court why the interest, motive or opportunity was dissimilar. See Dykes v. Raymark Indus., Inc.,
801 F.2d 810, 816-817 (6th Cir. 1986), cert. denied, 481 U.S. 1038 (1986).

 Stone objected at trial that the motive and opportunity to cross-examine Dr.
Hinshaw differed because many of the documents upon which she relied had not been discovered
at the time of the cross-examination. Dr. Hinshaw, based on his review of published medical
literature, was willing to testify that the medical and scientific community did not and could not
have known of the hazards of asbestos until the late 1970's. Stone based her case on internal
Owens-Corning documents and on unpublished studies performed by or on behalf of Owens-Corning or its predecesso